IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED NATIONAL INSURANCE COMPANY, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| INDIAN HARBOR INSURANCE COMPANY | : | NO. 14-6425 |

MEMORANDUM

Bartle, J.                                        February 8, 2016

        Before the court are the cross-motions for summary

judgment of plaintiff Penn-America Insurance Company

("Penn-America") and defendant Indian Harbor Insurance Company

("Indian Harbor").

        Penn-America was insured by Indian Harbor under a

professional liability insurance policy ("Indian Harbor policy").

Penn-America has sued Indian Harbor in this diversity action

alleging breach of contract, breach of duties, and waiver and

estoppel.[1]  It alleges that Indian Harbor improperly failed to pay

Penn-America or Penn-America's insureds amounts owed under the

Indian Harbor policy in connection with two separate underlying

coverage disputes involving Penn-America's insureds.

_____

1.  We previously granted the motion of Indian Harbor for judgment
on the pleadings on Penn-America's reformation claim.  We have
dismissed all claims brought by plaintiff United National Insurance
Company and dismissed the third party defendant Diamond State
Insurance Company.

Indian Harbor has moved for summary judgment on the meaning and application of the Indian Harbor policy in Counts I and III as well as on Penn-America's "breach of duties" claim in Count II.  Penn-America has moved for summary judgment in four separate motions and four accompanying briefs.[2]  Those motions request summary judgment on Indian Harbor's affirmative defenses two through twelve, partial summary judgment that the allocation provision in the Indian Harbor policy does not apply, partial summary judgment that Indian Harbor breached its contractual obligation to "pay on behalf of" Penn-America, and partial summary judgment that Indian Harbor may not as a matter of law deny coverage based on Exclusion (H) in the Indian Harbor policy.

I.

The following facts are not in dispute.  Both coverage claims at issue here arise under the Indian Harbor policy issued to United America Indemnity, Ltd.  Penn-America was insured under the policy as a subsidiary of United America Indemnity, Ltd.[3]  Under the Indian Harbor policy, Penn-America retained the first $1,000,000 per claim.

---

2.  By filing four separate motions and briefs, Penn-America has improperly circumvented, without the approval of the court, the page limits set forth in the court's scheduling order for summary judgment briefs.

3.  It appears that there are two separate Indian Harbor policies that apply to the two coverage disputes, but because the policies are identical, we will refer to them both as the Indian Harbor policy.

Penn-America's first claim arises out of an automobile accident caused by a patron of Peccadillos, Inc. ("Peccadillos"), Penn-America's insured.  The accident resulted in the deaths of two women and injuries to two children, collectively referred to as the "Swartwood claimants."  The Swartwood claimants sued Peccadillos in the Pennsylvania state court alleging liquor liability, punitive damages, and outrageous conduct/infliction of emotional distress. At the time, Peccadillos had a Penn-America insurance policy for $1,000,000 (hereinafter "Penn-America policy").  This policy excluded coverage for liquor liability.

After the Swartwood claimants filed suit against Peccadillos, Penn-America denied coverage based on the liquor liability exclusion in the Penn-America policy and took the affirmative step of suing for a declaratory judgment that it had no obligation to defend Peccadillos or to provide coverage.  Affirming a decision by the Court of Common Pleas of Erie County, a nine-judge panel of the Pennsylvania Superior Court held that Penn-America had a duty to defend on behalf of Peccadillos because some of the Swartwood claims fell outside the scope of the liquor liability exclusion.  The court did not reach the issue of coverage.  See Penn-America Ins. Co. v. Peccadillos, Inc., 27 A.3d 259, 268-69 (Pa. Super. Ct. 2011).

While the declaratory judgment action was pending, Penn-America refused a demand by the Swartwood claimants to settle for

-3-

the $1,000,000 Penn-America policy limit.  Peccadillos and
Swartwood then entered into consent judgments totaling $5,000,000
and sued Penn-America for breach of contract, common law bad faith,
and statutory bad faith based on Penn-America's conduct in the
original action.  Penn-America settled this lawsuit against it for
$3,500,000 in June 2014 (hereinafter "Peccadillos settlement").  It
is one of the settlements which is at issue here.

Penn-America sought compensation of $2,500,000 from
Indian Harbor for the Peccadillos settlement.  This sum represented
the $3,500,000 settlement minus the $1,000,000 retention.  Penn-
America asserted that the entire amount claimed was covered under
the Indian Harbor policy.  Indian Harbor subsequently paid
$1,500,000 towards the Peccadillos settlement as well as
$355,440.21 towards the defense fees and costs.  This left
$1,000,000 of the settlement above the retention, which Penn-
America now seeks to recover from Indian Harbor.

The second settlement stemmed from a lawsuit filed by
Colleen Jackson ("Jackson") against Penn-America's insured,
Sweet & Sassy, Inc. ("Sweet & Sassy"), after she was injured in an
automobile accident by one of Sweet & Sassy's intoxicated patrons.
Penn-America defended Sweet & Sassy in that action.  Jackson
litigated the case for more than six years before receiving a
$1,020,000 jury verdict against Sweet & Sassy in a Kentucky state

court.[4]  After the verdict, Penn-America settled the case with
Jackson on behalf of Sweet & Sassy for $1,028,250.

Jackson then amended her complaint to add claims against
Penn-America for acting in bad faith by failing to make a
reasonable settlement offer earlier in the litigation in spite of
clear liability.  She sought $350,000 in compensatory damages for
anxiety, mental anguish, worry, stress, and inconvenience.  She
also sought $3.4 million in punitive damages, statutory interest,
and attorney's fees.  The claim for statutory interest was
dismissed by the state court.  Penn-America settled these claims
with Jackson for $1,350,000 in October 2010 (hereinafter "Jackson
settlement").  Penn-America made a claim under the Indian Harbor
policy for $350,000, the amount of the settlement above the
$1,000,000 retention, plus attorney's fees.  Again, Penn-America
asserted that the entire Jackson settlement represented payment for
losses covered under the Indian Harbor policy.  Indian Harbor did
not pay anything towards the Jackson settlement because it
determined that covered losses fell below the $1,000,000 retention.

II.

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the movant shows that there is
no genuine dispute as to any material fact and the movant is

---

4.  At her first trial, Jackson won a $1,060,000 verdict against
Sweet & Sassy, but the verdict was overturned on appeal as a
result of erroneous jury instructions.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);
see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A
dispute is genuine if the evidence is such that a reasonable
factfinder could return a verdict for the nonmoving party.  See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  Summary
judgment is granted where there is insufficient record evidence for
a reasonable factfinder to find for the nonmovant.  See id. at 252.
"The mere existence of a scintilla of evidence in support of the
[nonmoving party]'s position will be insufficient; there must be
evidence on which the jury could reasonably find for [that party]."
Id.

        When ruling on a motion for summary judgment, we may
only rely on admissible evidence.  See, e.g., Blackburn v. United
Parcel Serv., Inc., 179 F.3d 81, 94-95 (3d Cir. 1999).  We view the
facts and draw all inferences in favor of the nonmoving party.  See
In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir.
2004).  However, "an inference based upon a speculation or
conjecture does not create a material factual dispute sufficient to
defeat entry of summary judgment."  Robertson v. Allied Signal,
Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

        A party asserting that a particular fact "cannot be or
is genuinely disputed" must support its assertion by "citing to
particular parts of materials in the record" or by "showing that
the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties.  See Fed. R. Civ. P. 56(c)(3).  It is not the responsibility of the court to "comb the record in search of disputed facts."  See N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Redevelopment Agency, 68 F. Supp. 3d 545, 549 (D.N.J. 2014).  Our Court of Appeals has emphasized that "'[j]udges are not like pigs, hunting for truffles buried in' the record." Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

As noted above, both sides have moved for summary judgment.  When confronted with cross-motions for summary judgment, our task remains the same, as such motions:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  We must consider the motions

separately.  See, e.g., Wernicki-Stevens v. Reliance Standard
Life Ins. Co., 641 F. Supp. 2d 418, 422 (E.D. Pa. 2009) (citing
Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.,
10 F.3d 144, 150 (3d Cir. 1993)).

III.

We now turn to the relevant provisions in the Indian
Harbor policy.  The parties do not dispute that, in this diversity
action, the substantive law of Pennsylvania applies.  See, e.g.,
Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir.
2000).

The interpretation of an insurance policy is a question
of law for the court.  See Pac. Indem. Co. v. Linn, 766 F.2d 754,
760 (3d Cir. 1985); 401 Fourth St., Inc. v. Inv'rs Ins. Grp., 879
A.2d 166, 171 (Pa. 2005).  The primary goal is to "ascertain the
parties' intentions as manifested by the policy's terms."  See
Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union
Ins. Co., 908 A.2d 888, 897 (Pa. 2006).  When the language of the
policy is clear, we give effect to its plain meaning.  See Am. &
Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 2 A.3d 526, 540
(Pa. 2010).  Yet, "when a provision in the policy is ambiguous,
'the policy is to be construed in favor of the insured to further
the contract's prime purpose of indemnification and against the
insurer, as the insurer drafts the policy and controls coverage.'"
Kvaerner Metals Div. of Kvaerner U.S., Inc., 908 A.2d at 893

-8-

(quoting <u>401 Fourth St., Inc.</u>, 879 A.2d at 170).  Policy language is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense."  <u>Madison Constr. Co. v. Harleysville Mut. Ins. Co.</u>, 735 A.2d 100, 106 (Pa. 1999)

   The Indian Harbor policy is not an all-risk policy but rather a policy that only covers certain specific risks subject to exclusions.  The Indian Harbor policy provides in Part I that "[t]he Insurer will pay on behalf of the **Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period** . . . for **Wrongful Acts**."[5]  The parties agree that Penn-America's claims for coverage based on the Peccadillos and Jackson settlements were "**Claims**"[6] made by an "**Insured**" during the "**Policy Period**."  The parties do not dispute that the Indian Harbor policy covers, as a "**Wrongful Act**," a claim against Penn-America alleging bad faith conduct.  "**Wrongful Acts**" are defined as "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an **Insured** in

_____

5.  It appears that the policy uses bold text to set apart terms and phrases defined therein.  To the extent that we quote from the policy, all bold text in this opinion appears in the policy and has not been added by the court.

6.  "**Claim**" is defined as, among other things, "any civil proceeding in a court of law or equity, including any mediation or alternative dispute resolution ordered or sponsored by such court" and "a written demand or notice to an **Insured** indicating that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**."

rendering, or in failing to render, **Professional Services**."[7] However, they disagree on the meaning and application of other provisions in the policy, including a provision allocating coverage (the "allocation provision") and Exclusion (H).

The allocation provision in the Indian Harbor policy provides a mechanism for apportioning losses covered by the policy and losses not covered by the policy.  Apportionment comes into play, for example, where Penn-America settles an underlying lawsuit which alleges individual claims or counts against Penn-America and some of the claims are covered under the Indian Harbor policy and some are not covered.  Under these circumstances, it must be decided how much if any of the settlement will be the ultimate responsibility of Indian Harbor.  The allocation provision in the Indian Harbor policy provides:

> [i]f both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insured** includes both covered and uncovered matters or because a **Claim** is made against both the **Insured** and others not included within the definition of **Insured**, the **Insured** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts.  The determination of a fair and proper allocation shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insureds**.  In the event that

---

7.  The policy also contains additional definitions of "**Wrongful Acts**" which are not relevant here.

an allocation cannot be agreed to, then the
Insurer will make an interim payment of the
amount of **Loss**, including **Defense Expenses**,
which the parties agree is not in dispute
until a final amount is agreed upon or
determination pursuant to the provisions of
this Policy and applicable law.

Penn-America argues that the allocation provision

requires Indian Harbor to cover the Peccadillos and Jackson

settlements because the word <u>loss</u> is written in bold text with a

capitalized first letter.  In particular, the first clause reads:

"**Loss** covered by this Policy and **Loss** not covered by this Policy."

Penn-America claims that the bold text and capitalization limit the

allocation provision to the narrow category of loss as defined in

Part II of the Indian Harbor policy.  Part II specifically states,

in relevant part, that "**Loss** shall not include . . . matters which

are uninsurable under the law pursuant to which this Policy

shall be construed . . . [and] any amount due under any contract

or policy of insurance."[8]  On this theory, because the definition

---

8.   Part II provides:

> "**Loss**" means damages, judgements [sic],
> awards, settlements, and the **Defense
> Expenses** which an **Insured** is legally
> obligated to pay as a result of a **Claim**.
> **Loss** includes punitive or exemplary damages
> when insurable under the law pursuant to
> which this Policy shall be construed.  Where
> the **Insurance Company** has determined in good
> faith that punitive or exemplary damages are
> insurable under applicable law, the Insurer
> will not raise as a defense to coverage the
> insurability of such damages; provided,

-11-

of "**Loss**" excludes contract liability, the allocation provision never assigns contract liability to Penn-America.

Penn-America's interpretation is both absurd and unreasonable.  An insurance policy provision "must be given a reasonable interpretation, in the light of the subject-matter and the situation [sic] of the parties at the time the contract was made, and such construction must not be manifestly absurd, nor effectually prevent a recovery under all circumstances."  See Janney v. Scranton Life Ins. Co., 173 A. 819, 820 (Pa. 1934).  If, in drafting the allocation provision, the parties had intended to distribute losses only within the narrow category of "**Loss**" as

---

however, that in the event of a challenge to such a determination by any other person or entity, the Insurer shall be obligated to reimburse such damages only if a court of competent jurisdiction specifically determines that they are insurable.  **Loss** shall not include:

. . .

(2) matters which are uninsurable under the law pursuant to which this Policy shall be construed;

. . .

(6) any amount due under any contract or policy of insurance or reinsurance underwritten, issued, assumed, or subscribed to by the **Insurance Company**.

"**Insurance Company**" refers to Penn-America, and, as relevant, "'**Defense Expenses**' means reasonable legal fees and expenses incurred by or on behalf of any **Insured** in the defense or appeal of any **Claim**."

-12-

defined in the policy, the allocation provision would have no apparent meaning.  Losses excluded by the Part II definition of "**Loss**" must be uncovered losses within the meaning of the allocation provision.  Otherwise we could not distinguish between covered and uncovered losses in the allocation provision.

Moreover, Penn-America's interpretation destroys the meaning of the next clause of the allocation provision, which explains that the provision applies where "a **Claim** made against the **Insured** includes both covered and uncovered matters."  According to Penn-America's interpretation, this clause applies only where an insured makes a single coverage claim based upon two separate settlements.  This cannot possibly be the meaning of this provision.  The allocation provision clearly allocates to Indian Harbor matters within the Part II definition of "**Loss**" and to Penn-America matters expressly excluded by the Part II definition.

Exclusion (H) of the Indian Harbor policy provides:

[t]he Coverage under this Policy does not apply to any **Claim**:

. . .

for an **Insured's** liability under any contract or agreement, regardless of whether such liability is direct or assumed; provided, that this EXCLUSION (H) will not apply to **Loss** an **Insured** would have sustained even in the absence of a contract or agreement or to preclude coverage for **Wrongful Acts** committed, or allegedly committed, in rendering **Professional**

-13-

**Services** pursuant to a policy of insurance
or other **Express Contract or Agreement**.

Under Exclusion (H), Penn-America cannot seek compensation from
Indian Harbor for its contract liability on a Penn-America policy
it issued to one of its insureds.  Consistent with Part I of the
Indian Harbor policy,[9] Exclusion (H) carves out of the exclusion
wrongful acts committed or allegedly committed by Penn-America.
Part I clearly establishes that the policy insures Penn-America
for wrongful acts, and Exclusion (H) confirms that coverage.
Thus, when a complaint includes allegations of both contract
liability and bad faith conduct, Exclusion (H) reiterates the
declaration in Part I of the policy that coverage exists for the
bad faith conduct which is a wrongful act, while excluding
coverage for the contract liability which is not a wrongful act
as previously noted.  Part I and Exclusion (H) demonstrate that
a contract liability claim against Penn-America is never covered
under the Indian Harbor policy.

It is critical here to determine which party has the
burden of proof on the issue of allocation.  Where the policy
provides coverage for a certain type of loss, the insured has the
burden of proving that the covered loss occurred.  See Betz v. Erie
Ins. Exch., 957 A.2d 1244, 1256 (Pa. Super. Ct. 2008)).  "[The

_____

9. As noted above, Part I provides that "[t]he Insurer will pay
on behalf of the **Insured Loss** from **Claims** first made against the
**Insured** during the **Policy Period** . . . for **Wrongful Acts**."

-14-

Pennsylvania] Supreme Court has long recognized that 'it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy.'"  Id. (quoting Miller v. Boston Ins. Co., 218 A.2d 275, 277 (Pa. 1966)). On the other hand, when the dispute involves an exclusion in the insurance policy, "the burden is upon the insured to show that a loss has occurred; thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion."  Wexler Knitting Mills v. Atl. Mut. Ins. Co., 555 A.2d 903, 905 (Pa. Super. Ct. 1989).

Our Court of Appeals, interpreting Pennsylvania law, has recognized that "there is a subset of exclusion cases that concerns exceptions to exclusions."  See Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co., 25 F.3d 177, 180 (3d Cir. 1994). In these cases, "[t]he burden is on the insured, not the insurer, to introduce evidence to show that the exclusion which appears to be triggered does not apply after all."  See id. (citing N. Ins. Co. v. Aardvark Assocs., Inc., 942 F.2d 189, 191 (3d Cir. 1991)).

Acknowledging these principles, the Pennsylvania Superior Court held in Executive Risk Indemnity, Inc. v. Cigna Corp., 74 A.3d 179 (Pa. Super. Ct. 2013), that "the insured is the party that should bear the burden of proof for apportionment of claims" where the insured seeks coverage for a settlement that it

-15-

resolved without a finding on liability.  See id. at 183; see also
John Hancock Healthplan of Pa., Inc. v. Lexington Ins. Co., 1990 WL
21137, at *3 (E.D. Pa. Mar. 6, 1990); Lang Tendons, Inc. v. N. Ins.
Co., 2001 WL 228920, at *11 (E.D. Pa. Mar. 7, 2001).

     Allocation "is best proven by the insured, the party
that has access to the evidence and the parties' intent behind
the settlement process."  See Exec. Risk Indem., Inc., 74 A.3d at
183; John Hancock Healthplan of Pa., Inc., 1990 WL 21137, at *3.
The Superior Court explained:

> [where] the parties were equally
> sophisticated entities, [and the insured]
> drafted the settlement agreement, chose
> counsel to participate in the settlement
> negotiations, controlled the underlying
> litigation and defense and had better access
> to the relevant information and intentions
> of the parties in the deliberative
> settlement process. . . . it is not only
> reasonable, but logical, that the insured
> bears the burden to allocate.

Exec. Risk Indem., Inc., 74 A.3d at 183.

     The dispute here concerns coverage for wrongful acts,
which are specifically covered risks, and does not involve the
application of a policy exclusion.  Part I expressly provides
that the Indian Harbor policy applies to wrongful acts.  Thus,
because Penn-America is the insured seeking coverage under the
Indian Harbor policy for its wrongful acts, "it is a necessary
prerequisite to recovery" that Penn-America proves that the

Peccadillos and Jackson settlements concerned covered wrongful acts.  See Betz, 957 A.2d at 1256; Miller, 218 A.2d at 277.

Likewise, as our Court of Appeals explained, where, as here, the case concerns a carve out to an exclusion, the insured has the burden to prove that the exclusion does not apply.  See Air Prods. & Chems., Inc., 25 F.3d at 180.  Thus, where Penn-America seeks to recover for an entire settlement which includes both breach of contract and bad faith claims, the burden is on Penn-America to prove that the exclusion in Exclusion (H) does not apply.

Finally, Executive Risk specifically places the burden of proof on the insured, in this case, Penn-America, in any allocation of covered and uncovered losses in the Peccadillos and Jackson settlements.  See Exec. Risk Indem., Inc., 74 A.3d at 183.  As the insured did in Executive Risk, Penn-America "drafted the settlement agreement[s] and was fully aware that allocation between the classes of claims would become a coverage issue" when it settled those actions without findings on liability.[10]  See id.

Accordingly, we will deny the motions of Penn-America for partial summary judgment that the allocation provision in the

10.  We note that while counsel for Penn-America opposes application of the Executive Risk burden of proof in this case, the same counsel supported application of Executive Risk in the underlying Peccadillo's action where placing the burden on the insured was to Penn-America's benefit as the insurer.

Indian Harbor policy does not apply and for partial summary judgment that Indian Harbor may not as a matter of law deny coverage for the Peccadillos settlement based on Exclusion (H).

IV.

We now consider the motion of Indian Harbor for summary judgment with regard to the Peccadillos settlement.[11]  This settlement resolved the lawsuit brought by Peccadillos and the Swartwood claimants against Penn-America alleging statutory bad faith, common law bad faith, and breach of contract.[12]  It is undisputed that the alleged bad faith conduct of Penn-America in the underlying Peccadillos action constituted wrongful acts covered by the Indian Harbor policy.  Penn-America asserts that the breach of contract claim is also covered by the Indian Harbor policy.  As explained above, the only risks covered are those that come within

---

11.  We construe Indian Harbor's motion and Penn-America's response as reaching both Counts I and III of the complaint.

12.  We treat the breach of contract claim as a claim for contract liability.  Penn-America argues in some, but not all, of its many summary judgment briefs that the breach of contract claim is based on a wrongful act and not contract liability.  However, in response to Indian Harbor's requests for admission, Penn-America stated:  "Penn-America admits that the Swartwood claimants and Peccadillos asserted, in the Peccadillos Coverage Action, that, inter alia, Penn-America owed indemnity under its policy."  Thus, Penn-America has admitted that Penn-America and Swartwood's breach of contract claim was based on Penn-America's alleged contract liability to Peccadillos under the Penn-America policy.  In addition, Penn-America has not offered any admissible evidence that the breach of contract claim was based on anything other than Penn-America's contract liability to Peccadillos under the Penn-America policy.

-18-

the definition of a **Wrongful Act**."  That definition does not include claims based on contract liability.

Indian Harbor concedes that it paid $1,500,000 of the $3,500,000 settlement to Penn-America because, in its view, $1,500,000 was the appropriate compensation for the claims alleging bad faith conduct covered under the policy.  The first $1,000,000 of the $3,500,000 settlement was subject to the retention clause.  According to Indian Harbor, Penn-America has not produced any evidence that the remaining $1,000,000 was for covered wrongful acts.

To prevent summary judgment in favor of Indian Harbor, Penn-America must present at least a genuine dispute of material fact in support of its claim on coverage or allocation.  See Fed. R. Civ. P. 56; Betz, 957 A.2d at 1256; Executive Risk, 74 A.3d at 183.  Penn-America, however, has not presented any evidence on which a jury could reasonably find that the $1,000,000 of the Peccadillos settlement in dispute represented payment for wrongful acts and not contract liability.

Penn-America's reliance on the expert report of James Marnen ("Marnen") is to no avail.  First, Penn-America has not submitted an affidavit or declaration by Marnen in support of his report.[13]  Our Court of Appeals has held that an unsworn expert

---

13.  We note that Indian Harbor submitted a transcript of Marnen's deposition in support of its motion to strike Marnen's

report "is not competent to be considered on a motion for summary judgment."  See Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989); Burrell v. Minn. Mining Mfg. Co., 2011 WL 5458324, at *1 n.1 (E.D. Pa. June 9, 2011).

Furthermore, Marnen's opinion does not deal with the underlying bad faith claims of Peccadillos against Penn-America. Penn-America admits that Marnen considered only the contract liability claim and did not evaluate the bad faith claims in assessing the allocation.  Since multiple claims were resolved by the Peccadillos settlement, Marnen cannot reliably opine on the value of one claim relative to the settlement amount without considering the other claim.  "An allocation is, by its very nature, a determination of the relative value — not the absolute value — of the items being assessed."  See, e.g., UnitedHealth Grp., Inc. v. Columbia Cas. Co., 47 F. Supp. 3d 863, 877 (D. Minn. 2014).  As the District Court for the District of Minnesota explained:

> [s]uppose a buyer purchases two paintings at an estate sale for a lump sum of $50 million. One of the paintings is by Picasso, and the other is by a different artist. . . . No expert could reliably opine on the amount of the $50 million purchase price that should be allocated to the Picasso without examining the other painting.  If, for example, the buyer

---

report and testimony.  Although this deposition could plausibly stand on its own as admissible evidence, it is not cited by Penn-America and, as explained herein, is not actually admissible.

hired an art expert, the expert examined only
the Picasso, and the expert opined that the
Picasso was worth $50 million, the expert
would have established the absolute value of
the Picasso.  But it would be impossible to
say whether all of the $50 million that was
paid for the two paintings should be allocated
to the Picasso without knowing its value
relative to the other painting.  And, of
course, no one could assess the Picasso's
relative value without assessing the value of
the other painting.

<u>Id</u>.  The opinion of Marnen is not admissible evidence.

Penn-America next relies on the deposition testimony of

two employees of Global Indemnity Group, Inc., Joyce Romoff

("Romoff") and Mark DiGiovanni ("DiGiovanni").  Global Indemnity

Group, Inc. is the parent company of Penn-America.  According to

Penn-America, this testimony is evidence of Penn-America's

subjective intent when settling the Peccadillos action that the

entire settlement be allocated to the bad faith claims.

There are several problems with this testimony.  First,

Penn-America does not cite the record or even attempt to explain in

its briefing papers who these individuals are, in what capacity

they were employed by Penn-America, or in what capacity they were

involved with the Peccadillos action.  In fact, it never even

identifies the first name of DiGiovanni in its briefs.  "'Judges

are not like pigs, hunting for truffles buried in' the record."

<u>Doeblers' Pa. Hybrids, Inc.</u>, 442 F.3d at 820 n.8.  The deposition

testimony of these individuals cannot create a genuine dispute of

material fact because Penn-America does not cite any evidence that
these individuals were personally involved in the settlement or had
personal knowledge of Penn-America's intent at the time.

Second, the testimony cited by Penn-America is not
relevant to allocation.  This testimony first articulates Penn-
America's position that the entire Peccadillos settlement was
covered by the Indian Harbor policy.  It then describes Penn-
America's intent in filing motions in the underlying Peccadillos
action, Penn-America's primary concern at settlement, and the
deponents' opinions about the settlement.  These statements
certainly are not evidence that the entire Peccadillos settlement
must be allocated to the bad faith claims.  Penn-America cannot
raise a genuine dispute of material fact that the appropriate
allocation of the Peccadillos settlement is entirely to covered
claims simply by offering its opinion that the underlying
plaintiffs were unlikely to succeed on their contract liability
claim.

Penn-America also references its responses to Indian
Harbor's requests for admissions.  However, these responses are not
evidence that the Peccadillos settlement concerned only the bad
faith claims and not the contract liability claim.  We first note
that Penn-America may not rely on its responses to the requests for
admissions because they are not admissible evidence.  "A party may
not utilize its own admissions at the trial.  It is only when the

-22-

admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent." See Charles Alan Wright & Arthur R. Miller, 8B Federal Practice and Procedure § 2264 (3d ed. 2015); In re Leonetti, 28 B.R. 1003, 1009 (E.D. Pa. 1983); Fed. R. Evid. 801(d)(2).

In addition, none of Penn-America's responses to the requests for admission is evidence that the entire Peccadillos settlement concerned the bad faith, and not the contract liability, claim.  In those responses, Penn-America denied that contract liability was the only issue in the case and denied that contract liability was relevant to Indian Harbor's obligations under the Indian Harbor policy.  Yet, Penn-America admitted that Peccadillos and the Swartwood claimants sought coverage from Penn-America under the Penn-America insurance policy.  This certainly is not evidence that the settlement concerned only the bad faith claim and not the contract liability claim.

Overall, Penn-America fails to grasp the very nature of settlements in general and of the present settlement in particular.  The complaint in the underlying lawsuit brought by Peccadillos and the Swartwood claimants against Penn-America contained claims for bad faith and contract liability.  The Peccadillos settlement clearly resolved the entire lawsuit, that is all claims.  Penn-America, in the final analysis, simply relies on its argument that the contract liability claim had no merit as a matter of law.  Even

-23-

if it is correct on the lack of merit of the contract liability claim, it cannot reasonably assert, based on the record before us, that no portion of this settlement accounted for the contract liability claim.  Settlement payments are often made for a claim even where the law clearly provides that that claim is not legally viable.  Meritless claims are at times settled in order to avoid legal fees and other costs, consumption of valuable time, distraction from more important matters, adverse publicity associated with continued litigation, and the risk, however remote, that the law might change or be misapplied.  A settlement brings peace, resolution, and certainty.

Here, absent the Peccadillos settlement, Penn-America would have been compelled to continue to incur the time and costs related to the contract liability claim until it was ultimately decided by the trial and appellate courts.  In sum, Penn-America, which has the burden of proof on allocation and coverage, has produced no evidence in support of its claim that the $1,000,000 in issue was for the covered bad faith claims and not for the uncovered contract liability claim.

Accordingly, we will grant the motion of Indian Harbor for summary judgment on Count I and Count III with respect to the Peccadillos settlement.

V.

We turn to the Jackson settlement.  It involved an underlying lawsuit in which Jackson alleged that Penn-America had acted in bad faith in refusing to settle her claims.  Jackson had sought both compensatory and punitive damages.  Her punitive damages claims were based on allegations that Penn-America's claims adjusters failed to attend mediations, made offers less than their settlement authority, and practiced without licenses in Kentucky. Under the terms of this settlement, Penn-America paid $1,350,000 to Jackson but did not admit liability.

Indian Harbor does not dispute that compensatory damages arising out of the bad faith claims were covered by the policy as wrongful acts.[14]  Instead, it argues that the Jackson settlement also resolved claims for uninsurable punitive damages and that any covered losses fell within the $1,000,000 retention in the Indian Harbor policy.  Penn-America responds that the entire Jackson settlement related to covered claims, and Indian Harbor must therefore compensate it for all amounts over the $1,000,000 retention.

The Indian Harbor policy states that punitive damages are only covered where they are insurable under Pennsylvania law.

---

14.  Again, as relevant, "**Wrongful Acts**" are defined in the Indian Harbor policy as "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**."

The policy reads: "**Loss** includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed."[15]   The Pennsylvania Superior Court has held that punitive damages directly imposed on a corporation are not insurable while vicariously imposed punitive damages are insurable. See Butterfield v. Giuntoli, 670 A.2d 646, 655 (Pa. Super. Ct. 1995); Esmond v. Liscio, 224 A.2d 793, 799-800 (Pa. Super. Ct. 1966).   It reasoned that "[w]here corporate management commits an outrageous act, punishment is appropriate," however "[w]here the act is committed by . . . an agent, not pursuant to corporate policy or plan, the corporation, though vicariously liable for

---

15.  As relevant, the Indian Harbor policy provides that:

> **Loss** includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed.  When the **Insurance Company** has determined in good faith that punitive or exemplary damages are insurable under applicable law, the Insurer will not raise as a defense to coverage the insurability of such damages; provided, however, that in the event of a challenge to such a determination by any other person or entity, the Insurer shall be obligated to reimburse such damages only if a court of competent jurisdiction specifically determines that they are insurable.  **Loss** shall not include:
>
> . . .
>
> (2) matters which are uninsurable under the law pursuant to which this Policy shall be construed.

punitive damages, is entitled to insure against such damages." See Butterfield, 670 A.2d at 655 (citation omitted).

Recently, our Court of Appeals "predict[ed] that the Pennsylvania Supreme Court would conclude that, in an action by an insured against his insurer for bad faith, the insured may not collect as compensatory damages the punitive damages awarded against it in the underlying lawsuit." Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 492 (3d Cir. 2015). However, that action involved direct, and not vicarious, liability.

We reiterate that Penn-America, as the insured under the Indian Harbor policy, has the burden to prove coverage and allocation. See Exec. Risk Indem., Inc., 74 A.3d at 183; Betz, 957 A.2d at 1256. Thus, on summary judgment, we must consider whether Penn-America has raised a genuine dispute of material fact in support of its claim that its covered losses exceeded the $1,000,000 retention under the Indian Harbor policy. See Fed. R. Civ. P. 56. It has not. It has not come forward with any evidence of what amount if any of the Jackson settlement should be allocated to coverage under the Indian Harbor policy, let alone any evidence that that amount exceeded the $1,000,000 retention threshold.

With regard to compensatory damages for the bad faith claim, Penn-America makes no attempt to prove the amount of these damages in the Jackson settlement. Instead, Penn-America simply contends that Jackson's entire claim for punitive damages was

-27-

covered by the Indian Harbor policy.  But, even assuming vicarious
liability is insurable under Pennsylvania law, Penn-America does
not cite any admissible evidence that any punitive damages in the
Jackson settlement were based on Penn-America's vicarious
liability.

Penn-America points to unsworn communications written by
its own counsel in its attempt to prove that any punitive damages
in the Jackson settlement were covered.  Even in the unlikely event
counsel was planning to testify at trial, Penn-America would have
had to have produced sworn testimony or writings by counsel during
discovery to defeat the motion of Indian Harbor for summary
judgment.  A document is not admissible under Rule 56 of the
Federal Rules of Civil Procedure unless it is attached to an
affidavit or declaration by the author.  See Fowle, 868 F.2d at 67.

Penn-America next argues that Indian Harbor, in its
briefing papers, admits that no corporate management or corporate
policy was involved in the alleged conduct.  Penn-America misstates
the record.  On the page cited by Penn-America, Indian Harbor
states that the conduct "reflected company policy, not the rogue
acts of a single employee."  Indian Harbor then refers to
DiGiovanni's testimony, on behalf of Penn-America:

> Q: And did Penn America – is it Penn America's
> corporate policy that adjusters must be
> licensed in the state in which the claim takes
> place –

. . .

>A: Depends.  If the claim is handled by
>counsel as well, as this was, there is not a
>requirement that you be licensed.

Clearly, this is not evidence which can defeat Indian Harbor's motion for summary judgment.

Penn-America also cites to Romoff's testimony concerning the Jackson settlement.  Yet, as explained above, Romoff's testimony about the Jackson settlement is inadmissible because Penn-America has not pointed to record evidence of her personal knowledge of Penn-America's intent at the time of the Jackson settlement.  Further, even if Romoff were qualified to testify on Penn-America's intent at the Jackson settlement, her testimony is not relevant to allocation.  On the pages cited by Penn-America, Romoff testifies that she did not believe Penn-America faced any punitive damage exposure and "couldn't see how Penn-America was even facing the bad faith claim."  This testimony is certainly not evidence that the Jackson settlement pertained only to claims covered under the Indian Harbor policy, let alone that the entire $1,350,000 settlement related to covered compensatory damages or vicarious punitive damages.

Lastly, Penn-America objected to Indian Harbor's interrogatory requesting the basis for Penn-America's "contention that Penn-America faced exposure only to vicariously assessed punitive damages and not directly assessed punitive damages in the

-29-

Jackson Action and identify the evidence that you believe supports your contention." It provided no substantive response in support of its coverage position in the interrogatory just as it has provided no evidence supporting its coverage position on summary judgment.

Accordingly, we will grant summary judgment in favor of Indian Harbor on Count I and Count III because Indian Harbor has not produced evidence that the Jackson settlement was covered to any extent by the Indian Harbor policy.

VI.

We next address the motion of Indian Harbor for summary judgment on Penn-America's claim for breach of duties in Count II. Count II alleges that Indian Harbor breached its duties to Penn-America by "engag[ing] in a pattern or practice of improperly investigating claims, refusing to pay defense costs and demanding improper allocation of loss in violation of its common law and statutory obligations." Penn-America further accuses Indian Harbor of misrepresenting policy provisions, demanding reinsurance information, relying on provisions of the Indian Harbor policy that do not apply, and wrongfully denying payments to Penn-America.

Indian Harbor seeks summary judgment on the ground that Penn-America never specifically cites 42 Pa. Cons. Stat. § 8371, the Pennsylvania bad faith statute. Under Pennsylvania law, "a plaintiff is not obliged to state the legal theory or theories

-30-

underlying his complaint." See DelConte v. Stefonick, 408 A.2d 1151, 1153 (Pa. Super. Ct. 1979); Gavula v. ARA Servs., Inc., 756 A.2d 17, 22 (Pa. Super. Ct. 2000). Rather, it is enough that "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form." See Pa. R. Civ. P. 1019(a). The failure to cite § 8371 is not fatal.

Count II further states a claim for relief for breach of duties under Pennsylvania common law. "Section [8371] does not alter [the plaintiff's] common law contract rights." See Birth Ctr. v. St. Paul Cos., Inc., 787 A.2d 376, 386 (Pa. 2001). Thus, "[u]nder Pennsylvania law, bad faith by an insurance company can give rise to two separate causes of action: a breach of contract action for violation of an insurance contract's implied duty of good faith, and a statutory action under the terms of Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371." Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 496-97 (3d Cir. 2015).

Indian Harbor also argues that Count II is barred by the statute of limitations. A two-year statute of limitations applies for a § 8371 claim. See Haugh v. Allstate Ins. Co., 322 F.3d 227, 236 (3d Cir. 2003); Ash v. Cont'l Ins. Co., 861 A.2d 979, 984 (Pa. Super. Ct. 2004). The common law breach of duties claim has a four-year statute of limitations. See, e.g., CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co., 645 F. Supp. 2d 354, 364-65

(E.D. Pa. 2009).   The "[d]efendant bears the burden of establishing as a matter of law that plaintiff's claims are barred by the statute of limitations."   See Goddard v. State Farm Mut. Auto. Ins. Co., 992 F. Supp. 2d 473, 478 (E.D. Pa. 2014) (citing Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 487 (3d Cir. 1985)).

The statute of limitation starts to run when the plaintiff's right to institute and maintain the suit arises.   "[A] claim accrues when a plaintiff is harmed and not when the precise amount or extent of damages is determined."   Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1042 (Pa. Super. Ct. 1999).   A bad faith claim accrues when the insurer denies coverage.   See Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 224–25 (3d Cir. 2005).   "Thus, where an insurer clearly and unequivocally puts an insured on notice that he or she will not be covered under a particular policy for a particular occurrence, the statute of limitations begins to run and the insured cannot avoid the limitations period by asserting that a continuing refusal to cover was a separate act of bad faith."   CRS Auto Parts, Inc., 645 F. Supp. 2d at 365. "Repeated or continuing denials of coverage do not constitute separate acts of bad faith giving rise to a new statutory period." Goddard, 992 F. Supp. 2d at 478.

Indian Harbor first notified Penn-America on October 6, 2010 that it did not have a claim for compensation under the Indian Harbor policy for the Jackson settlement.   On that date, Indian

-32-

Harbor advised Penn-America that "it is Indian Harbor's view that
. . . the amount of covered Loss, together with Defense Expenses
. . . would not exceed the $1 million retention amount."
Therefore, this claim for relief accrued on October 6, 2010.
However, the present action was not filed until October 9, 2014,
more than four years after the claim accrued.  As such, both the
statutory and common law breach of duties claims are barred by the
statute of limitations with regard to the Jackson settlement.

As for the Peccadillos action, Indian Harbor did not
deny coverage to Penn-America until June 2014.  The statute of
limitations clearly does not bar the statutory or common law bad
faith claims in the Peccadillos action.  Hence, we now must
consider whether Penn-America produced any evidence that the
alleged breach of duties took place.

Penn-America has the burden to prove the bad faith of
Indian Harbor alleged in Count II.  See, e.g., Polselli v.
Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994).
Yet, Penn-America has not pointed us to any evidence in the record
supporting its claim with respect to the Peccadillos settlement.
Rather, Penn-America cites to the entire 215-page transcript of
DiGiovanni's deposition.  Not only does Penn-America fail to
"cit[e] to particular parts of materials in the record" as required
by the Federal Rules of Civil Procedure, it also does not explain
what admissible evidence is contained in that transcript.  See Fed.

-33-

R. Civ. P. 56(c).  Again, it is not our role to review the
deposition to find evidence helpful to Penn-America.  See Fed. R.
Civ. P. 56(c)(3); Doebler's Pa. Hybrids, Inc., 442 F.3d at 820 n.8.
Penn-America has failed to demonstrate that DiGiovanni's testimony
is relevant or admissible evidence.

Penn-America then cites to Exhibit 16, a sixteen-page
document, which it describes as stating Penn-America's responses to
Indian Harbor's interrogatories.  It contends that this document
includes a detailed list of Indian Harbor's bad faith conduct.
However, Exhibit 16 contains "Indian Harbor's Objections and
Responses to Penn-America's First Set of Interrogatories."  We have
examined this document written by Indian Harbor in response to
Penn-America's interrogatories and, as one might expect, it does
not contain a list of Indian Harbor's bad faith conduct.  Not even
the interrogatories themselves, which were presumably written by
counsel for Penn-America, mention Indian Harbor's alleged bad
faith.  Exhibit 16 is not evidence in support of Penn-America's
claim.

Penn-America also refers to the deposition testimony of
Dan Bailey ("Bailey"), an insurance expert for Indian Harbor.  On
the pages cited by Penn-America, Bailey states his belief that, in
the general context of resolving insurance disputes, the parties
should use their best efforts.  This is nothing more than a
precatory statement completely detached from the facts at issue in

-34-

this action.   In addition, Penn-America does not explain the
relevance of Bailey's testimony to this action.   Bailey's testimony
is not evidence supporting Count II of the complaint.

We will grant the motion of Indian Harbor for summary
judgment on the breach of duties claim in Count II of the
complaint.[16]

VII.

Finally, we will deny the motion of Penn-America for
summary judgment based on the alleged breach by Indian Harbor of
"the pay on behalf of" provision of the Indian Harbor policy.   That
provision states:   "[t]he Insurer will pay on behalf of the
**Insured Loss** from **Claims** first made against the **Insured** during
the **Policy Period** . . . for **Wrongful Acts**."   Penn-America alleges
that Indian Harbor breached this provision by failing to make
payments directly to the Jackson and Peccadillos claimants.   Indian
Harbor counters that no such breach occurred because Penn-America
waived this provision in connection with the Peccadillos settlement
and the provision was not applicable to the Jackson settlement.

Waiver is the "voluntary and intentional
relinquishment or abandonment of a known existing legal right,

---

16.   Penn-America argues that Indian Harbor engaged in bad faith
conduct during this litigation after this action was filed.   Count
II alleges a breach of duties based on Indian Harbor's conduct
prior to litigation.   If Penn-America seeks to allege new acts of
bad faith conduct separate and apart from the acts alleged in Count
II, it must bring a separate lawsuit based upon those acts.

advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed." Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989) (citation omitted). Waiver may take place in one of three ways. First, "express waiver is in the nature of a new contract, which modifies the old." Id. Second, "an estoppel, on the other hand, forbids the assertion of the truth, i.e. the contract, by one who has knowingly induced another to believe what is untrue, i.e. that strict contractual compliance will not be demanded, and as such misleads another to act accordingly." Id. Third, "implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived." Id.

With regard to the Peccadillos settlement, Indian Harbor paid $1,500,000 plus defense costs to the parent company of Penn-America, Global Indemnity Group, Inc., for the bad faith claims. In doing so, Indian Harbor acted pursuant to Penn-America's specific and detailed instructions. In an August 1, 2014 letter, Penn-America wrote:

> [t]he claimants are in the process of
> finalizing and submitting their motion(s) to
> approve the settlement. Once the settlement
> is approved, payment will become due. <u>To
> allow us to be able to make payment in a</u>

-36-

> timely fashion, please forward XL's[17]
> settlement payment to Penn-America as soon
> as you can.

(emphasis added).  Then, on August 11, 2014, Penn-America stated
that "[p]ayment should be directed as follows: Global Indemnity
Group, Inc., P.O. Box 821417, Philadelphia, PA 19182-1417" and
"[Penn-America's] W9 is attached."

When Penn-America specifically instructed Indian
Harbor to pay Global Indemnity Group, Inc. in these August 2014
communications, Penn-America waived any obligation Indian Harbor
may have had to make payment directly to the underlying
claimants.  Penn-America now disingenuously argues that it made
these August 2014 requests only because Indian Harbor had
previously refused to honor its requests for payment directly to
the claimants.  Penn-America refers to an October 2010
communication in which it cited Part I of the policy, among many
other provisions.  This October 2010 communication came nearly
four years before the Peccadillos settlement and Penn-America's
demand that payment be made to its parent company.  Penn-America
cannot refute its specific requests in August 2014 by citing a
four-years old, generalized reference to the Indian Harbor
policy.  This October 2010 communication is not admissible
evidence on the issue of Penn-America's waiver.

---

17.  XL Professional Insurance is the corporation that handled
the Peccadillos settlement on behalf of Indian Harbor.

Penn-America also maintains that its August 2014 request was made only after Indian Harbor refused its June 2014 requests for payment directly to the underlying claimants. But those June 2014 communications were demands that Indian Harbor pay the entire Peccadillos settlement, not instructions that Indian Harbor make payments directly to the claimants. They state: "XL is required to <u>pay</u> the settlement on behalf of the insured, not merely contribute to the settlement"; "we again demand that XL live up to its obligations under the policy to pay the full settlement in excess of retention"; and "[w]e look forward to confirmation from XL that it will fund the settlement." These demands are not evidence that can overcome Penn-America's waiver. It simply is not correct for Penn-America to say it requested a payment to its parent company only after Indian Harbor refused to pay the claimants directly. Thus, Penn-America has waived the "pay on behalf of" provision with regard to the Peccadillos settlement.

Furthermore, there is no evidence that Indian Harbor owes Penn-America any sum of money for the Jackson settlement. Because Indian Harbor does not owe anything for the Jackson settlement, there cannot have been a breach of the "pay on behalf of" provision.

Accordingly, we will deny the motion of Penn-America for partial summary judgment that Indian Harbor breached its contractual obligation under the "pay on behalf of" provision.[18]

---

18.  We will also deny as moot: (1) the motion of Penn-America for summary judgment as to affirmative defenses two through twelve raised by Indian Harbor; (2) the motion of Indian Harbor to strike the report and proposed testimony of plaintiff's expert James Marnen; and (3) the motion of Indian Harbor to strike the report and proposed testimony of plaintiff's expert Michael Aylward.  Penn-America never cited to Michael Aylward's report or testimony in its summary judgment briefs.